**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PAULA Y. WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13 C 1116 |
| | ) | |
| THE OFFICE OF THE CHIEF JUDGE | ) | Judge Jorge L. Alonso |
| OF COOK COUNTY, ILLINOIS and | ) | |
| MICHAEL ROHAN, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court are two motions: (1) plaintiff's motion for summary judgment of liability on Count III of the Second Amended Complaint; and (2) defendants' motion for summary judgment. For the reasons explained below, plaintiff's motion is denied and defendants' motion is granted.

## BACKGROUND

Plaintiff, Paula Y. Williams, sues the Office of the Chief Judge of Cook County, Illinois (the "Office") and Michael Rohan, who was the Director of Court Services and Chief Executive Officer of the Office's Juvenile Probation Department, for breach of contract, estoppel, retaliatory discharge for exercising rights under the Illinois Workers' Compensation Act (the "IWCA"), violation of the Illinois Whistleblower Act, and unlawful race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §§ 1981 and 1983. Williams worked in the Juvenile Probation Department from November 1995 until her employment was terminated in late August 2011.

Plaintiff moves for summary judgment of liability on Count III, her IWCA claim against the Office. Defendants move for summary judgment on all eight counts of the Second Amended Complaint.

## DISCUSSION

**A.      Summary Judgment Standards**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering such a motion, the Court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *See Kvapil v. Chippewa Cnty., Wis.*, 752 F.3d 708, 712 (7th Cir. 2014). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Talanda v. KFC Nat'l Mgmt. Co.*, 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013).

## B.    Facts

The following relevant facts are undisputed except where noted.[1]  Plaintiff Williams is an

African-American woman who was formerly employed as a probation officer in the Office's

Juvenile Probation Department.  Her job duties included interviewing juveniles charged with

crimes, visiting their homes and schools, referring them to social services, and attending court

---

[1]The Court derives these facts from the parties' Local Rule 56.1 statements and responses. Local Rule 56.1 "is designed, in part, to aid the district court, 'which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information," in determining whether a trial is necessary." *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011) (citation omitted).  Local Rule 56.1(a) requires a moving party to file a statement of material facts as to which the party contends there is no genuine issue and that entitle the party to a judgment as a matter of law and include within each paragraph "specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph."  Local Rule 56.1(b) requires each party opposing summary judgment to submit "a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon."  In many instances, plaintiff indicates disagreement with defendants' statements but fails to cite evidence in the record to refute the statements.  Moreover, plaintiff's responses often fail to directly address a statement, and they are riddled with extraneous facts and argument.  In a few instances, defendants' responses also fail to address a statement in full or support a disagreement by citing evidence.  "When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion." *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009).  Accordingly, where a party has failed to properly dispute the opposing party's properly-supported facts, the Court has deemed those facts admitted for purposes of the instant motions.

Plaintiff has also submitted a list of additional facts that require denial of summary judgment. (R. 113 at 41-46.)  Some of these statements contain statements of opinion, not fact (e.g., certain individuals were "shockingly ignorant of their duties with regard to the Workers Compensation Act"); others are irrelevant (e.g., after plaintiff had been terminated, certain documents were "handed back" to her without having been read "carefully"); and others contain improper legal argument (e.g., "[d]efendants' conception . . . is contrary to clear directives of the Illinois courts"). (*Id.* ¶¶ 3, 17, 6.)  The Court has disregarded those of plaintiff's statements that do not comply with the Local Rules.  *See Cichon v. Exelon Generation Co.*, 401 F.3d 803, 809-10 (7th Cir. 2005) ("A district court does not abuse its discretion when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed.").

hearings. Plaintiff and the five other probation officers in her unit, who are all African-American, reported to Michael Willis, who is also African-American. Prior to her termination, plaintiff had been in the same unit for more than fifteen years.

The Office has more than two thousand employees and has seven departments, one of which is the Juvenile Department, that report to the Chief Judge. The Juvenile Department has approximately five hundred employees. At all relevant times, defendant Michael Rohan was its director. He was responsible for reviewing and approving all decisions relating to the termination of any employee in the Juvenile Department, and his decisions were subject to review by the Office. Rohan worked with Bruce Wisniewski, the head of Human Resources for the Office, when issues arose regarding employees' conduct.

The Court will review the relevant facts in chronological order.

**Plaintiff's Conversation with Georganne Struss and Robin Petchenik**

Plaintiff's version of this conversation is as follows. On December 4, 2008, plaintiff was walking by the office of Robin Petchenik, a co-worker who is Caucasian, where Petchenik was talking with Georganne Struss, another co-worker who is Caucasian. Plaintiff did not work with either of the women on a daily basis, nor was she supervised by either. Petchenik beckoned plaintiff over, so plaintiff went into Petchenik's office and joined their conversation. Plaintiff asked Struss, "Where have you been? I haven't seen you." Struss replied, "I'm in Maywood." Plaintiff asked how Struss liked Maywood, and Struss replied, "Oh, it's okay. When you go black, you never go back, and when you're white, you're always right." (R. 103-2, Dep. of Paula Williams 59-60.) Plaintiff was offended and did not respond; she simply walked out of the office. (*Id.* 60-61.) Prior to the incident, plaintiff and Struss had been "cordial co-workers," and neither Struss nor Petchenik had said anything like that to plaintiff before. (*Id.* 53, 62.)

Struss and Petchenik tell the story differently.  According to them, they were socializing in Petchenik's office when plaintiff came into the office of her own accord and joined their conversation.  (R. 103-8, Dep. of Robin Petchenik 87-88; R. 103-7, Dep. of Georganne Struss 55.)  Plaintiff mentioned that she had not seen Struss in a long time, (Petchenik Dep. 18, 58; Struss Dep. 26), and Struss said that she had been transferred to Maywood, (Struss Dep. 26).  Plaintiff told Struss that she looked good, like she had lost weight, (Petchenik Dep. 18, 58; Struss Dep. 26), and asked what she was doing, (Struss Dep. 26).  Struss replied that she was wearing all black and "once you wear black, you don't (or, "never," according to Petchenik) go back."  (Struss Dep. 26; Petchenik Dep. 18-19, 58.)  Williams laughed and walked out of the office. (Struss Dep. 26, 37-38; Petchenik Dep. 19, 58.)  Petchenik denies that Struss said, "when you're white, you're always right," or anything similar to that phrase.  (Petchenik Dep. 63.)[2]

On December 8, 2008, plaintiff wrote a memorandum about the conversation to Charles Young, who was the Deputy Director of the Juvenile Probation Department.  (R. 103-6, Dep. of Charles Young 4.)  The subject was "Racial intimidation in the workplace," and the memorandum stated as follows:

> This is to memorialize the comments made to me in the late afternoon, of December 4, 2008 in the office of [Supervising Probation Officer] Robin Petchenik.  The other officer is [Probation Officer] Georgann[e] Struss.  The statement made to me by both was "When you go black you never go back and when you are white, you are always right."  In no way did it seem harmless.  I interpreted it with the same venomous tone that I can only remember seeing on the television when Klu [sic] Klux Klan meetings were shown.  I turned away and left that office wondering, why would they make that statement to me?
>
> Cc: Michael Rohan
> Michael Willis

---

[2]It appears that Struss was not asked at her deposition whether she used the phrase, but she denied that Williams's version of the conversation was true.  (Struss Dep. 26-27.)

(R. 103-22.)  When asked at her deposition why she had attributed the alleged statement to both Struss and Petchenik, plaintiff said that "even though . . . the words came out of Georganne Struss's mouth, Robin called me over there to her office and that is why I'm attributing it to both of them because I felt as though Robin called me so I could hear what Georganne had to say." (Williams Dep. 65.)

On December 10, 2010, Rohan sent Williams a memorandum acknowledging receipt of her memorandum.  Rohan's memo stated as follows:

> I am in receipt of your memorandum of December 8, 2008, which addresses serious concerns regarding inappropriate language of co-workers in the work place.  Please note that our department does not condone such behavior and these comments appear out of character for the individuals that you attribute them to.  I have requested that Charles Young contact you immediately to ascertain additional facts so that he might initiate an investigatory meeting involving the two officers that you alleged to have made these comments.
> Please accept my apology on behalf of the department for the behavior as described in this memorandum.

(R. 103-23.)

Plaintiff claims that in December 2008 at the Probation Department's holiday party, Rohan approached her at the punch bowl in front of Lavatte [Powell], who was serving punch, "put his hand on [plaintiff's] shoulder," and "instructed [plaintiff] not to mention" her December 8 memorandum "to anyone outside of the building."  (Williams Dep. 82.)  Rohan does not recall any such discussion and does not recall if he even attended the party.  (R. 103-4, Dep. of Michael Rohan 80-81.)  Powell, who is a clerk in the Juvenile Probation Department, states in an affidavit that she remembers serving punch at the holiday party, but never saw or overheard Williams and Rohan speaking to each other at that event or anywhere else.  (R. 103-24.)

Charles Young investigated the December 4 incident by meeting with Williams and Rose Golden, who was the Director of Human Resources for the Juvenile Probation Department. (Young Dep. 23-26; Williams Dep. 66-68.)  They discussed what had happened, and plaintiff said she had "felt threatened." (Young Dep. 26.)  Young also interviewed Struss and Petchenik separately to hear their version of events.  (*Id.* 27-31.)  They said that the conversation had been about clothes, not race.  (*Id.* 47.)  Young was unable to reach any conclusion about whose account of the conversation was accurate.  (*Id.* 31.)  The timing of these interviews is disputed. Plaintiff says that Young and Golden did not interview her until somewhere between March and May 2009.  (Williams Dep. 66-67.)  Golden could not recall the order of the interviews, but remembered that they took place within "days" of Rohan's December 10 memorandum.  (R. 103-3, Dep. of Rose Marie Golden 64-67.)  Young testified that he first met with Williams and then with Struss and Petchenik separately.  (Young Dep. 22-24.)

Young met with Rohan and Golden to discuss the matter.  (*Id.* 32.)  Young summarized what Williams, Struss, and Petchenik had told him.  (*Id.* 34-35; Rohan Dep. 72.)  Young, Rohan, and Golden decided that Struss and Petchenik "would be admonished as far as being careful what they say."  (Young Dep. 36.)  Young and Golden met with Struss and Petchenik individually to tell them to be careful with what they say in conversation.  (*Id.* 37.)  Struss and Petchenik were verbally admonished but not formally disciplined, and nothing concerning the matter was put into Struss or Petchenik's personnel files.  (Golden Dep. 69-70.)  Documents concerning plaintiff's complaint were placed in her personnel file.  (*Id.*)  At some point a year or more later, Young created a memorandum summarizing his investigation when he realized that he had neglected to create one in 2008.  (Young Dep. 50-53.)

**Plaintiff's Complaint to the Office of Inspector General**

In March 2010, plaintiff made a complaint to the Office of Inspector General[3] ("OIG") about a supervisor in the Juvenile Probation Department who, according to plaintiff, was making telephone calls about union matters during work hours. (Williams Dep. 21-23; 26.) The Office investigated the matter, and the supervisor was ultimately disciplined by receiving a "short suspension." (Rohan Dep. 88, 90, 120.) Rohan was not involved in the investigation or privy to the specifics, but became aware at some point that Williams was the one who had made the complaint. (*Id.* 89.)

**Plaintiff's Injury and Termination**

On May 27, 2010, Williams reported that her arm and shoulder had been injured at work that day when a co-worker, Anthony Jordan, "yanked" a door open from one side while plaintiff had been holding the door handle and about to enter from the other side. (R. 103-14, Employee's Accident Report.) Shortly thereafter, Williams took medical leave, filed a workers' compensation claim, and began receiving temporary total disability ("TTD") benefits. On June 10, 2010, Rose Golden sent plaintiff a letter confirming plaintiff's medical leave status and Golden's receipt of plaintiff's physician's documentation and instructing plaintiff to let Golden know once plaintiff was able to determine her return date. (R. 103-16.) The letter also stated that prior to her return, plaintiff would have to request a Return to Work certification from the County Medical Office and provide the medical office with a diagnostic report and release to return to work from plaintiff's personal physician. (*Id.*)

---

[3]The parties do not specify, but it appears that they are referring to the Cook County Office of the Independent Inspector General.

On December 20, 2010, Dr. William A. Heller conducted an Independent Medical Evaluation ("IME") of Williams and prepared a report. (R. 103-17.) In his report, Dr. Heller diagnosed Williams with a "right shoulder strain" and stated that further treatment of Williams's injury was neither "reasonable" nor "necessary" and that Williams was capable of returning to her regular work duties. (*Id.* 3-4.) Evidently, no one in the Juvenile Probation Department, Office of the Chief Judge, or other division of Cook County took any action on the IME report until June 2011, when Jason Henschel, a claims adjuster for the Cook County Department of Risk Management,[4] began reviewing Williams's workers' compensation claim file. (R. 103-13, Dep. of Jason Henschel 21.) After Henschel reviewed Williams's file, including the IME report, he brought the report to Rose Golden's attention. (*Id.* 34, 38.) In an e-mail dated July 22, 2011, Henschel told Golden: "Per IME report, [employee] is able to work full duty. We need to get her over to the Medical Unit for work clearance. Then once cleared by the Medical Unit, I can terminate her TTD benefits. Can we talk on [M]onday? Thanks." (R. 104-3, Henschel Dep., Ex. 6.) Henschel cannot recall whether they talked that Monday (or at all) about Williams's case. (Henschel Dep. 38.)

On July 26, 2011, Golden sent plaintiff a letter stating as follows:

Dear Paula,

On July 25, 2011, I received a copy of an Independent Medical Exam report dated 12-20-10 indicating that you were cleared to return to work full duty. Based on that report it is our interpretation that you should have returned to work by now. You are required to report to work on Tuesday August 2, 2011. You are directed to report to the Human Resources Section on the 8th floor at 8:30 A.M.

---

[4]The Cook County Department of Risk Management administers workers' compensation claims on behalf of County entities, including the Office and the Juvenile Probation Department. (R. 110, Defs.' Resp. Pl's L.R. 56.1 Stmt. ¶ 9.)

**Prior to your return, you will be required to report to the County Medical Office at 118 N. Clark Street, Room 849, Chicago, to request a Return to Work Certification. It is necessary that you provide the medical office a diagnostic report and release to return to work (including restrictions, if any) from your personal physician. (See attached Hours of Operation and Return to Work Instructions)**

As a reminder, failure to return to work will constitute an implied resignation. According to Article V, Section 4 (B) of your union contract *"Termination is immediate and implied upon the occurrence of one of the following: . . . (2) Failure to report to work at the termination of leave of absence or vacation, unless the employee has an explanation acceptable to the Employer for such failure to report to work."*

Please contact me immediately if you have any questions regarding this directive.

Sincerely,

Rose Marie Golden
Director of Human Resources
Cook County Juvenile Probation Department

CC:    Michael J. Rohan
       Charles M. Young
       Personnel File

(R. 104-18.)  It is undisputed that after Golden sent this letter, Williams did not contact Golden or anyone else in the Juvenile Probation Department during July or August 2011.[5]  (Williams Dep. 37-42.)

---

[5]Plaintiff asserts that it is "disputed" that she failed to contact Rose Golden or her supervisor, Michael Willis, upon receipt of the July 26, 2011 letter. (R. 113, Pl.'s Resp. Defs.' L.R. 56.1 Stmt. ¶ 12.)  This is one example of plaintiff's improper and evasive Rule 56.1 responses.  Plaintiff explains that this statement is disputed because she was in contact with Andrew Marzal, her workers' compensation attorney, who in turn was in contact with Assistant State's Attorney Jeremy Schwartz, who handles workers' compensation cases for the County, but this assertion is not responsive to the content of the statement.  The record is clear that upon receipt of the letter, plaintiff herself failed to contact Golden or anyone else in her department.  Therefore, the Court deems admitted paragraph 12 of defendants' Local Rule 56.1 Statement.

On August 1, 2011, Williams did report to the Cook County Medical Office for a return-to-work evaluation. There, Dr. Joan Mankowski, an attending physician employed by Cook County, evaluated Williams. (R. 103-12, Dep. of Joan Mankowski 4-5.) According to the "Physician's Approval to Return to Work" ("RTW") form that the medical staff completed that day based on Dr. Mankowski's notes, Dr. Mankowski concluded that Williams was able to return to work on August 2, 2011. (R. 103-12, Mankowski Dep. 29-30 & Ex. 4.) The RTW form states: "IT IS IN MY OPINION THAT THE PHYSICAL CONDITION OF [PAULA WILLIAMS] IS SUCH THAT HE OR SHE CAN RETURN TO WORK AUGUST 2, 2011. I HAVE ADVISED HIM/HER TO REPORT TO HIS/HER PERSONNEL DEPARTMENT AT THIS TIME." (*Id.* Ex. 4.) The RTW form also states at the bottom: "FULL DUTY PER IME 12/20/2010" and "PERSONAL PHYSICIAN NOTE PT UNABLE TO RETURN TO WORK." (*Id.*) The form was faxed to Jason Henschel. (R. 103-13, Henschel Dep. 43-44.)

On August 2, 2011, Henschel faxed a letter to plaintiff's workers' compensation attorney, Andrew Marzal. The letter stated in pertinent part as follows:

RE:    CLAIM NO. 20100682
       DATE OF ACCIDENT: 5/27/2010
       DEPARTMENT: Office of Chief Judge
       CLAIMANT: Paula Williams

Dear Mr. Marzal:

Please be advised that Paula Williams' TTD (Temporary Total Disability) Benefits have been terminated based upon your client's release for full duty based on the medical documentation received in our office. The last day TTD has been paid was 8/1/2011. Per the IME report dated 12/20/2010, your client has been released to work full duty. Also, per your client's appointment at the Cook County Medical Division on 8/1/2011, your client has been cleared for full duty work.

Sincerely,
Jason Henschel
Cc: Jeremy Schwartz, State's Attorney

(R. 103-26.)

On August 3, 2011, Marzal sent a fax to Assistant State's Attorney Jeremy Schwartz, who handles workers' compensation cases for Cook County. (R. 103-27; R. 103-10, Dep. of Jeremy Schwartz 4, 77.) The subject line of the fax states "Paula Williams V. Cook County/Probation Office," and the "Notes/Comments" section states:

> Enclosed please find Dr. Labanauskis' [sic] off work note dated June 29, 2011. This is good through her next office visit on August 10, 2011. I will be filing a Petition for an Immediate Hearing before Arbitrator Prieto on his August 31, 2011 status call date.

> Demand is made for reinstatement of T.T.D. benefits which were suspended on August 1, 2011.

(R. 103-27 at 1.) Attached to the fax was a document titled "Work Status Report" and signed by Dr. Ignas Labanauskas, plaintiff's personal physician. (*Id.* at 2.) The Report stated that Williams was "unable to return to work until [follow-up appointment] on 8/10/11 @ 1:00 PM." The "Diagnosis" line stated: "FX [fracture] of R humerus; cervical radiculitis." (*Id.*)

On August 16, Marzal sent Schwartz a fax stating: "Attached please find return to work note written by Dr. Laubanauskis [sic] allowing Ms. Williams to return to work on September 3, 2011, which oddly is a Saturday. Realistically, she will be back on Tuesday, September 6, 2011 after the Labor Day weekend." (R. 103-28 at 1.) The attached Work Status Report from Dr. Labanauskas was dated August 10, 2011 and stated that Williams could "Return to modified duty: on 9/3/11." (*Id.* at 2.)

At some point in August, and probably on August 22, Marzal and Schwartz had an in-person conversation about Williams's case at the Illinois Workers' Compensation Commission ("IWCC") offices in Chicago. (R. 103-9, Dep. of Vincent Andrew Marzal 25-26, 38-40; Schwartz Dep. 28-29.) Marzal recalls that he told Schwartz that the County was relying on an "old" IME report, Williams was nearly ready to return to work, and the County should still be paying her TTD benefits. Schwartz replied that they should try to work this out like they work out all of their other cases. (Marzal Dep. 26-27.) Marzal also recalls that he told Schwartz that Dr. Labanauskas had released Williams to return to work on September 3, but because that was a Saturday, "realistically" Williams would be back at work on September 6. According to Marzal, Schwartz was "in concurrence" with Williams returning to work on that date and said "he would communicate that to his client." (*Id.* 40-41.) Schwartz, on the other hand, recalls only generally that they discussed settlement and insists that he told Marzal multiple times that Williams would have to contact her human resources department about a return-to-work date and that he did not agree to the September 6 return to work because he had no authority over return-to-work dates. (Schwartz Dep. 24, 30-31, 38-39, 46-48, 78.)

On August 24, Marzal sent Schwartz a fax stating in relevant part as follows:

My client advises that Jason Henschel at Cook County Risk Management office has suspended her T.T.D. payment as of August 1, 2011. You and I discussed this issue at the Illinois Workers' Compensation Commission on Monday, August 22, 2011. Previously, I had faxed you Dr. Laubanauskis' [sic] return to work note with the comment that Ms. Williams will return to work on the first working day after the Labor Day weekend. This is Tuesday, September 6, 2011.

Demand is made for the immediate reinstitution of T.T.D. benefits. If refused, Petitioner shall file a Petition for Penalties and Fees. The termination of benefits is untimely and unjustified if it based [sic] upon the IME report of Dr. Heller dated December 20, 2010.

In addition, there remain unpaid numerous bills such as the ones from Injured Workers Pharmacy and Premier Physical Therapy. Demand is made for the immediate payment of these as well. These are enclosed.

. . .

Your client's written reply to this demand is required pursuant to Rule 7110.70 of the Rules Governing Practice before the Illinois Workers' Compensation Commission. It will be interesting to learn of Jason [Henschel]'s comments.

(R. 103-29.) Marzal and Schwartz had further settlement discussions.

On August 30, 2011, Golden sent plaintiff a letter stating as follows in pertinent part:

Dear Paula,

On July 26, 2011, I sent a letter to you via both certified and regular mail directing you to return to work on August 2, 2011 based on the results of an Independent Medical Review dated December 20, 2010. In that letter, you were also informed that ". . . failure to return to work will constitute an implied resignation. According to Article V, Section 4 (B) of your union contract *"Termination is immediate and implied upon the occurrence of one of the following: . . . (2) Failure to report to work at the termination of leave of absence or vacation, unless the employee has an explanation acceptable to the Employer for such failure to report to work."* I have also been informed that your Worker's Compensation benefits were terminated effective August 1, 2011.

To date, I have not received any communication from you indicating your intention to return to work. You [sic] failure to return to work on August 2, 2011 and your failure to contact the department to request an extension of your leave, constitutes an implied resignation. Therefore, we are considering your position to be vacant.

. . .

If you need further information please contact our Personnel Department . . . . Best wishes to you in all future endeavors.

Sincerely,

Rose Marie Golden
. . .

(R. 103-19.) Golden sent this termination letter with Michael Rohan's approval and after also having consulted with Charles Young and Bruce Wisniewski. (Golden Dep. 7-9, 58; Rohan Dep. 9-11, 15, 55; R. 103-11, Dep. of Bruce Wisniewski 6.) At the time Golden sent the letter, she did not know that plaintiff's personal physician had not yet cleared her to return to work, nor did she know about the workers' compensation negotiations between Marzal and Schwartz. (Golden Dep. 30-31, 36-38.)

On September 6, 2011, Williams showed up at Golden's office and advised Golden that she did not think she was required to report to work until that day. Plaintiff told Golden that the State's Attorney's Office had authorized her return to work on September 6. (*Id.* 46-49.) After this meeting, Golden called Schwartz to ask if he had authorized the September 6 return to work, and he replied that he had not. (*Id.* 50-51.) She also conferred with Rohan about the situation. (*Id.* 49-50.) Golden then wrote a letter to Williams, erroneously dated August 30 but sent on September 6 or 7, in which she stated that she was "reaffirming" the department's "assertion that [Williams's] actions constituted an implied resignation . . . ." (Golden Dep. 45-46 & R. 103-21.) The letter also stated: "It is important to note that in our meeting you stated that your attorney was informed by the State's Attorney's Office that you should report to work on September 6, 2011. I contacted the State's Attorney's Office who informed me that this statement was not factual." (R. 103-21.)

Regarding Williams's workers' compensation claim, Marzal and Schwartz negotiated and ultimately agreed upon a written settlement agreement, which Williams signed on September 22, 2011. (R. 103-31.) Williams agreed to accept a lump-sum settlement of $47,336.65, which represented "4% loss of use man-as-a-whole, 17.5% loss of use of the right

arm and 6 weeks of TTD ($4,399.98)." (*Id.* at 2.) Williams received $37,249.15 after deductions for attorney's fees and expenses.

### C.    Plaintiff's Motion for Summary Judgment of Liability on Count III / The Office's Cross-Motion for Summary Judgment on Count III

Plaintiff moves for summary judgment on Count III, her claim for discharge in retaliation for exercising her rights under the IWCA, 820 ILCS 305/4. The Office cross-moves for summary judgment on this claim. To prevail on a claim for retaliatory discharge, plaintiff must prove that (1) she was employed by the defendant at the time she was injured; (2) she exercised a right under the IWCA; and (3) she was discharged and her discharge was causally related to the exercise of her rights under the IWCA. *See Beatty v. Olin Corp.*, 693 F.3d 750, 753 (7th Cir. 2012) (quoting *Clemons v. Mech. Devices Co.*, 704 N.E.2d 403, 406 (Ill. 1998)); *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 773 (7th Cir. 2012) (applying Illinois law).

It is undisputed that the Office employed Williams at the time she was injured, she exercised her workers' compensation rights, and she was discharged. The only disputed element is causation. "To establish causation, the employee 'must affirmatively show that the discharge was primarily in retaliation for [her] exercise of a protected right.'" *Phillips v. Cont'l Tire The Ams., LLC*, 743 F.3d 475, 477 (7th Cir. 2014) (quoting *Gordon*, 674 F.3d at 774). Illinois law requires the plaintiff to offer affirmative evidence of causation in order to survive summary judgment. *Reid v. Neighborhood Assistance Corp. of Am.*, 749 F.3d 581, 587 (7th Cir. 2014) (citing *Gacek v. Am. Airlines, Inc.*, 614 F.3d 298, 300, 303 (7th Cir. 2010)). The "ultimate issue" for causation "is the employer's motive in discharging the employee." *Beatty*, 693 F.3d at 753 (quoting *Clemons*, 704 N.E.2d at 406). Plaintiffs may establish causation through direct or circumstantial evidence; typically, the evidence will be circumstantial. *Reid*, 749 F.3d at 587.

"The element of causation is not met if the employer has a valid basis, which is not pretextual, for discharging the employee." *Hartlein v. Ill. Power Co.*, 601 N.E.2d 720, 728 (Ill. 1992).

The Office states that plaintiff's employment was terminated for the reasons set forth in Golden's letter of August 30, 2011: plaintiff's failure to return to work on August 2, 2011 and her failure to contact the department to request an extension of leave. (R. 110, Defs.' Resp. Pl.'s L.R. 56.1 Stmt. ¶ 17.) Plaintiff contends that she "was expressly terminated based on an IME, in full knowledge that she had made a workers compensation claim" and that she is entitled to summary judgment on Count III because her termination was therefore wrongful under Illinois law. (R. 105, Pl.'s Mem. Supp. Mot. 10.)

Plaintiff relies on three decisions of the Illinois Appellate Court that dealt with disputed medical reports in workers' compensation cases. The first is *Clark v. Owens-Brockway Glass Container, Inc.*, 697 N.E.2d 743 (Ill. App. Ct. 1998), in which the employer discharged the employee because it believed that her claim for benefits was exaggerated. The court held that an employer may not discharge an employee on the basis of a dispute about the extent or duration of a compensable injury. *Id.* at 746-47. The second is *Hollowell v. Wilder Corp. of Delaware*, 743 N.E.2d 707 (Ill. App. Ct. 2001), in which the employer relied on the results of a disputed IME to demand that the employee, who had filed for workers' compensation benefits, return to work or else be fired. When the employee refused, he was fired. The court held that the purpose of the IWCA would be violated "if an employer can dismiss an employee on the grounds of being lazy and not working when said employee's personal physician has ordered the employee not to return to work." *Id.* at 711-12. The third decision plaintiff relies on is *Grabs v. Safeway, Inc.*, 917 N.E.2d 122 (Ill. App. Ct. 2009), where the employee plaintiffs had workers'

17

compensation petitions pending at the time of their discharge and, although an independent examiner had said that they were able to return to work, their personal physicians recommended that they remain off work. *Id.* at 125-26. The employer had relied on the IME in discharging the employees when they failed to report for work, and the court held that when an employer is faced with conflicting medical opinions from the employee's doctor and the employer's IME, the employer "may not rely solely on an IME in terminating an employee for failing to return to work or for failing to call in his absences." *Id.* at 129.

*Clark, Hollowell,* and *Grabs* do not apply here because there is no evidence that Golden and Rohan or any other decisionmaker relied on an IME that they knew to be disputed in deciding to terminate Williams's employment. The facts of this case are similar to those of *Beatty*, where the decision to terminate plaintiff Beatty's employment had been made by the defendant's manager of labor relations, Bill Moore. 693 F.3d at 752-54. Moore based his decision on information he had received from a clerk that Beatty had not reported for work or called in his absence for a couple of weeks. Prior to his termination, Beatty was injured at work and had been submitting off-work notes from his personal physician to defendant's medical department. *Id.* at 751-52. An IME had taken place, and the medical department was aware of the possibility that Beatty would seek workers' compensation. *Id.* at 752. But there was no evidence that Moore had talked with anyone in the medical department or was otherwise aware of Beatty's medical status when he issued the termination order. *Id.* at 753. The Seventh Circuit affirmed the district court's grant of summary judgment in favor of defendant, reasoning in relevant part as follows:

The district court held, and we agree, that no evidence supports Beatty's claim that he was fired because of his assertion or anticipated assertion of workers' compensation rights. . . .

. . . [O]n the undisputed record evidence, Moore fired Beatty because he failed to show up at work or call in, as required by plant rules—*not* because of his injury, the gaps in his doctor's notes, or the possibility that he might file a workers' compensation claim. . . .

. . . Beatty faults Moore for discharging him for failing to call in from November 7 to 13 when he was simply following the instructions he received from Olin's medical department to attend an IME. True enough, the evidence does point to an obvious failure of communication. But the retaliatory-discharge cause of action is narrow and requires evidence of *retaliatory motive*, not just sloppy personnel practices. The critical fact here is that Moore didn't know about Beatty's injury or medical status when he issued the termination order. That Olin's right hand didn't know what its left hand was doing is not actionable as a retaliatory discharge. *See Horton v. Miller Chem. Co.*, 776 F.2d 1351, 1359 (7th Cir. 1985) (applying Illinois law) (explaining that a decision to terminate based on misleading or incomplete information does not amount to retaliation).

. . . Beatty insists that Moore either knew or should have known about his medical status and possible workers' compensation claim, and that a reasonable jury could reject Moore's claim of ignorance as "dishonest." But Beatty offers no *evidence* to support this assertion. . . .

. . . Nothing in the record links Moore's enforcement of Olin's call-in policy to a retaliatory purpose. Beatty argues that DeProw's[6] November 19 email provides the link. In it DeProw refers to Beatty's absence and the results of the IME report, and also says that she "discussed termination with our labor relations group" and states her belief that Beatty "will be getting an attorney." But this email was sent several days *after* Moore terminated Beatty. Moore is not a listed recipient, and there is no evidence that DeProw or anyone else with knowledge of Beatty's injury talked to Moore about Beatty's case. In short, no evidence suggests that Moore was privy to any of DeProw's comments before he made the termination decision. If there were, we would have a different case. *Cf. Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 774 (7th Cir. 2008) (applying Illinois law) (holding that if emails exchanged between decisionmakers and other employees evidenced retaliation, then summary judgment was inappropriate).

693 F.3d at 753-55.

To establish a question of fact regarding retaliation, it is *essential*, but not always *enough*,

for a plaintiff to demonstrate that the decisionmakers involved in the termination had knowledge

---

[6]DeProw was a nurse and defendant's supervisor of disability claims. 693 F.3d at 752.

of her assertion of rights under the IWCA. *See Reid v. Neighborhood Assistance Corp. of Am.*, No. 11 C 8683, 2013 WL 1087557, at *10 (N.D. Ill. Mar. 14, 2013), *aff'd*, 749 F.3d 581; *Goode v. Am. Airlines, Inc.*, 741 F. Supp. 2d 877, 893-94 (N.D. Ill. 2010) ("Plaintiff is confusing necessary with sufficient conditions." (quotation marks omitted)) (citing *Casanova v. Am. Airlines, Inc.*, 616 F.3d 695, 697 (7th Cir. 2010)); *Marin v. Am. Meat Packing Co.*, 562 N.E.2d 282, 286 (Ill. App. Ct. 1990). Plaintiff has shown somewhat more than Beatty did. She has shown that Golden and Rohan,[7] the persons who made the decision to terminate her employment, were aware that she had filed a workers' compensation claim and that Golden was aware that plaintiff was receiving TTD benefits (or at least that she had been until August 1, 2011). (R. 110, Defs.' Resp. Pl's L.R. 56.1 Stmt. ¶ 15.) But considering the evidence as a whole, as this Court must do, *see Reid*, 749 F.3d at 587, the mere fact that Golden and Rohan knew that plaintiff had been receiving workers' compensation benefits is not sufficient to establish that plaintiff is entitled to summary judgment on Count III or even to raise a genuine issue of material fact as to whether there is a causal relationship between her discharge and the exercise of her rights under the IWCA. Stated differently, there is insufficient evidence for a rational jury to conclude that the reasons for firing plaintiff were mere pretext. There is no

---

[7]While Golden and Rohan stated that they consulted Charles Young in making this decision, Young stated that he did not play a role in the decision to terminate Williams. (Young Dep. 10.) In any event, there is no evidence that Young knew anything more about Williams's situation than Golden and Rohan did, and he stated that he was unsure whether he had known that Williams had been on workers' compensation during the time she had been on leave. (*Id.* 14.) The situation is similar regarding Bruce Wisniewski. Golden was "confident" that she had "sent information" to Wisniewski about Williams's termination, (Golden Dep. 58-60), but did not remember particulars. Rohan stated that Wisniewski would have been consulted, but also did not remember any details. (Rohan Dep. 15.) Wisniewski believed that he had been "consulted" about the decision but had no specific recollection of the circumstances. (Wisniewski Dep. 6-8.) There is no evidence that Wisniewski knew any particulars about Williams's workers' compensation claim.

evidence that Golden and Rohan knew *anything more* than the fact that plaintiff had been receiving workers' compensation.[8]  Plaintiff has offered no evidence that any with knowledge of her personal physician's note or the negotiations between the workers' compensation attorneys was responsible for terminating her employment or influenced the termination decision.  She also offers no evidence that there are any County procedures in place pursuant to which Golden or Rohan would have been in regular communication with workers' compensation attorneys in the State's Attorney's Office[9] or with the Department of Risk Management.  Plaintiff had already received TTD benefits for over a year, so the timing of her discharge is not suspicious.[10]  Furthermore, plaintiff did not contact Golden or anyone else in the Juvenile Probation Department until after having received the August 30 termination letter.

---

[8]Plaintiff argues in her memorandum in opposition to the Office's motion for summary judgment that "Rohan testified that he may have also known that the IME was disputed," citing page 24 of the transcript.  (R. 115, Pl.'s Mem. Opp'n Office's Mot. 7.)  Plaintiff misstates the evidence.  Rohan said merely that he may have made an "inquiry as to whether Ms. Williams had provided the diagnostic report from her personal physician that's referenced in" the July 26 letter from Golden.  (Rohan Dep. 24.)

Plaintiff does not suggest that Golden and Rohan, to the extent they do not recall knowing anything more, are unworthy of belief.  But even if she had, she would have had to offer some evidence to support any assertion that a reasonable jury could reject their claims of ignorance as dishonest.  *See Beatty*, 693 F.3d at 754; *Reid*, 749 F.3d at 589 n.7.

[9]The evidence is to the contrary, which is regrettable.  Golden, the head of Human Resources for the Juvenile Probation Department, did not regularly communicate with the County's workers' compensation attorneys, (Golden Dep. 39-40), despite the obvious personnel problems that could, and did, occur as a result.  Golden also testified that the Cook County medical department "usually" does not send RTW forms to her; it simply gives them to employees and instructs them to give the form to their human resources department.  (*Id.* 32.)

[10]Of course, "[t]he lack of temporal proximity between the filing of a workers' compensation claim and the employee's discharge" "does not *necessarily* defeat causation."  *Brooks v. Pactiv Corp.*, 729 F.3d 758, 768 (7th Cir. 2013).  Timing is just one of several circumstances that the Court considers.

Plaintiff contends that "a discharge is retaliatory so long as the chain of events leading up to the termination results from the workers compensation claim," (R. 116, Pl.'s Reply 4), and all she need show is that the request for her to return to work was premised on an IME and "the persons involved in the termination decision were aware that Plaintiff was on workers compensation leave," (*id.* 3-4). Plaintiff is incorrect. "Causation 'requires more than a discharge in connection with filing a claim.'" *Phillips*, 743 F.3d at 477 (quoting *Marin*, 562 N.E.2d at 286). In support of her argument, plaintiff cites *Clark*, but fails to acknowledge that the Seventh Circuit has criticized *Clark* and rejected this line of reasoning as follows:

> Phillips argues that his discharge was "causally related" to his initiation of his claim under the Workers' Compensation Act and relies on [*Clark*], 697 N.E.2d 743 (1998), which states: "An employer may discharge an injured employee who has filed a workers' compensation claim as long as the reason for the discharge is *wholly unrelated* to the employee's claim for benefits under the Workers Compensation Act." That misstates the law. "But-for" causation is not sufficient to establish retaliatory discharge. *See, e.g.*, *Clemons*, 704 N.E.2d at 407-08; *see also* [*Casanova*], 616 F.3d 695, 698 (7th Cir. 2010) (observing that *Clemons* "rejected an argument that but-for causation is enough to establish retaliatory discharge" and that [*Grabs*], 917 N.E.2d 122 (2009), and *Finnerty v. Personnel Board*, 707 N.E.2d 600 (1999), "like *Clemons* reject the argument that a fired worker can establish causation by showing that a workers' compensation claim set in motion a chain of events that ended in discharge") . . . .

*Phillips*, 743 F.3d at 478 (some citations omitted).

Clearly, there was a failure of communication among County departments. But Henschel and Schwartz's knowledge of plaintiff's doctor's note and the negotiations in her workers' compensation proceeding cannot be imputed to Golden or Rohan simply because they worked in a different division of Cook County. The salient questions are the decisionmakers' motivation and what they actually knew at the time of plaintiff's termination. A decision to terminate based on misleading or incomplete information does not amount to retaliation. *Horton,* 776 F.2d at

1359; *Beatty*, 693 F.3d at 754. Plaintiff must offer some evidence of a retaliatory motive based on her exercise of workers' compensation rights, not just "sloppy personnel practices" or that the County's right hand didn't know what its left hand was doing. *See Beatty*, 693 F.3d at 754. She has not provided any. Accordingly, the Court denies plaintiff's motion for summary judgment of liability on Count III and grants the Office's motion for summary judgment on Count III. In light of this ruling, the Court need not reach the parties' arguments regarding the Office's affirmative defenses to Count III.

**D.      Defendants' Motion for Summary Judgment**

Defendants move for summary judgment on plaintiff's remaining claims. Counts I, II, V, and VI are brought against the Office only. Count IV is brought against the Office and Rohan. Counts VII and VIII are brought against Rohan only.

**1.      Breach of Contract (Count I)**

In Count I, plaintiff alleges that by terminating her employment, the Office "breached its agreement that Plaintiff would return to work on September 6, 2011." (Second Am. Compl. ¶ 59.) Plaintiff's theory is that her attorney, Marzal, and the Office's attorney, Schwartz, agreed that plaintiff would return to work on that date and "memorialized" this agreement in her workers' compensation settlement agreement, which stated that plaintiff's return-to-work date was "09/07/11." (*Id.* ¶¶ 56-57.)

"Under Illinois law, a plaintiff asserting a breach of contract claim 'must plead and prove: (1) the existence of a contract, (2) the performance of its conditions by the plaintiff, (3) a breach by the defendant, and (4) damages as a result of the breach.'" *DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 626 (7th Cir. 2013) (quoting *Law Offices of Colleen M.*

*McLaughlin v. First Star Fin. Corp.*, 963 N.E.2d 968, 981 (Ill. App. Ct. 2011)). Oral agreements are enforceable under Illinois law if there is an offer, an acceptance, and a meeting of the minds regarding the terms. *Quinlan v. Stouffe*, 823 N.E.2d 597, 603 (Ill. App. Ct. 2005).

The first mention in the record of a September 6 return to work is in Marzal's August 16 fax to Schwartz. It states merely that plaintiff "realistically" would be back on that date. The Office characterizes this communication as an offer and argues that there is no evidence that Schwartz ever accepted it. (R. 107, Office's Mem. Supp. Mot. Summ. J. 4.) The Office cites Schwartz's testimony that he did not agree at any time that plaintiff could return to work on September 6 (or any other date) and that he did not have the authority to do so. (Schwartz Dep. 35-36 ("I do know I instructed [Marzal] on more than one occasion that I can't speak for the department on return to work. [Plaintiff] needs to contact the department and work that out. I don't have the authority to represent to him or the petitioner that she can return on her own time frame."). The Office also cites Golden's testimony that the County's workers' compensation attorneys did not have authority to negotiate return-to-work dates without her input. (Golden Dep. 104.)

In response, plaintiff contends that Marzal's testimony that Schwartz orally agreed to plaintiff's September 6 return to work presents a genuine issue of material fact. (R. 115, Pl.'s Mem. Opp'n Office's Mot. 2 (citing Marzal Dep. 40-41).) But plaintiff does not adequately address Schwartz's lack of authority to enter into such an agreement. Plaintiff has not come forward with evidence from which a reasonable jury could conclude that Schwartz was authorized to contract with plaintiff in regard to her return to work. Plaintiff asserts in a conclusory fashion that "by authorizing attorney Schwartz to settle the TTD issue, Defendants

were in fact authorizing Schwartz to negotiate the date when Plaintiff would be required to return to work," (*id.* at 4), but fails to support this argument. Plaintiff also points to her workers' compensation settlement agreement, which is on an IWCC form titled "Settlement Contract Lump Sum Petition and Order." (R. 103-31.) The agreement was executed after her termination; plaintiff signed the form on September 22, 2011, and the attorneys signed it in November 2011. Plaintiff argues that the form's reference to "09/07/11" on the line for "Return-to-work date" is evidence that Schwartz had agreed to that date. The Court is unpersuaded. Plaintiff fails to acknowledge that the form also states: "Petitioner terminated on August 30, 2011 for alleged job abondonment [sic]." Moreover, the date does not appear in the section of the form titled "Terms of Settlement." (*Id.* at 2.) Nothing in that section pertains to Williams's return to work.

Because plaintiff has failed to show a genuine issue as to Schwartz's authority to bind the Office to a return-to-work date, the Court will grant the Office's motion for summary judgment on plaintiff's claim for breach of contract.

## 2. Estoppel (Count II)

In Count II, plaintiff claims that "[i]n the event that it is determined that the [Office] did not enter into a binding agreement that Plaintiff would not be required to return to work before September 6, 2011, the [Office] is estopped from asserting that Plaintiff was required to report to work before September 6, 2011" and from denying that plaintiff was temporarily totally disabled through that date. (Second Am. Compl. ¶¶ 71-72.) Plaintiff alleges as follows:

> The [Office], through its attorney, represented to Plaintiff that she would not be terminated if she failed to report to work by August 2, 2011 if she had an explanation acceptable to the [Office] for her failure.

25

Plaintiff relied on the [Office's] representation in that she failed to report for work by August 2, 2011 because she had a good explanation for not returning to work: her treating physician ordered her not to report to work until August 11, 2011 and then September 1, 2011, and these facts were reported to Defendant's attorney.

Further, once Plaintiff's intention to report to work on September 6, 2011 was reported to the [Office's] attorney, neither the [Office] nor its attorney timely expressed any disagreement with that intention. The failure to respond took place under circumstances where a reasonable person would have construed that silence as agreement, which is what Plaintiff did.

On the contrary, the [Office's] attorney agreed and represented that Plaintiff would not have to report for work before September 6, 2011.

Plaintiff further relied on the [Office's] representations and conduct when she prepared to return to work on September 6, 2011, and did not return before that date. Because of Plaintiff's detrimental reliance on the [Office's] promises, actions and omissions to act, Plaintiff lost her job and has lost salary and benefits.

(*Id.* ¶¶ 66-70.)

"[A] finding of estoppel against a public entity is not favored." *Gorgees v. Daley*, 628 N.E.2d 721, 725 (Ill. App. Ct. 1993). "To invoke equitable estoppel against a public entity there must be an affirmative act on the part of the public entity and the inducement of substantial reliance by that affirmative act. The party seeking to assert equitable estoppel against the public entity must show that the entity made a misrepresentation with knowledge that the misrepresentation was untrue." *Cmty. Landfill Co. v. Pollution Control Bd.*, 772 N.E.2d 231, 235 (Ill. App. Ct. 2002) (citation omitted). "The affirmative act which induces a party must be an act of the municipal entity itself, such as legislation, rather than the unauthorized act of a ministerial officer. Generally, a public body cannot be estopped by an act of its agent beyond the authority expressly conferred upon that official, or made in derogation of a statutory provision." *Gorgees*, 628 N.E.2d at 725. "[T]he private party must have not only substantially changed its position, based on the affirmative act of the municipality or its officials, but also

justifiably done so, based on its own inquiry into the municipal official's authority." *Patrick Eng'g, Inc. v. City of Naperville*, 976 N.E.2d 318, 331 (Ill. 2012) (citations omitted).

Plaintiff cites no authority whatsoever in support of her contention that material factual issues preclude summary judgment on this claim, and it is unclear what particular representation or affirmative act plaintiff is relying upon. Plaintiff simply refers vaguely to "Schwartz's promises." (R. 115, Pl.'s Mem. Opp'n Office's Mot. 5.) She cites no authority in support of the argument made in paragraph 68 of the complaint that silence equals assent, and in any event the argument flies in the face of the requirement of an affirmative act. Plaintiff also has failed to come forward with any evidence indicating that Schwartz had the authority to extend her return-to-work date or that she or Marzal inquired about Schwartz's authority to do so. In response to Schwartz and Golden's testimony that the County's workers' compensation attorneys were not authorized to negotiate or extend return-to-work dates, it is insufficient for plaintiff to state only that "clients are accountable for what their attorneys do," see *id.* For the reasons discussed *supra* with respect to the breach of contract claim, it is also insufficient for plaintiff to point to the workers' compensation settlement form.

The Court will enter summary judgment in favor of the Office on Count II.

**3.      Retaliation in Violation of the Illinois Whistleblower Act (Count IV)**

In Count IV, plaintiff claims that the Office and Rohan terminated her employment in violation of the Illinois Whistleblower Act, 740 ILCS 174/1 *et seq.* (the "IWA"), based on two events: (1) plaintiff's 2008 complaint for "racial intimidation" in the workplace; and (2) her 2010 complaint to the OIG. (Second Am. Compl. ¶ 85.) The IWA provides that an employer may not retaliate against an employee "who discloses information in a court, an administrative

hearing, or before a legislative commission or committee, or in any other proceeding, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation" or "for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation." 740 ILCS 174/15.

Defendants argue that this claim, to the extent it seeks money damages, is time-barred by the one-year statute of limitations contained in the Illinois Local Governmental and Governmental Employees Tort Immunity Act ("Tort Immunity Act"), 745 ILCS 10/8-101(a). Plaintiff's claim accrued on August 30, 2011, when plaintiff was notified of her termination. *See, e.g.*, *Cunliffe v. Wright*, 51 F. Supp. 3d 721, 731 (N.D. Ill. 2014) (citing *Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 267 (7th Cir. 1995)). A retaliatory-discharge claim is a tort, so the Act, including its statute of limitations, applies. *See Foster v. Costello*, No. 13 C 3066, 2014 WL 1876247, at *9-10 (N.D. Ill. May 9, 2014) (Pallmeyer, J.); *Kirley v. Bd. of Educ. of Maine Twp. High Sch. Dist. 207*, No. 13 C 1706, 2013 WL 6730885, at *11 (N.D. Ill. Dec. 20, 2013) (Holderman, J.); *but see Zelman v. Hinsdale Twp. High Sch. Dist. 86*, No. 10 C 154, 2010 WL 4684039, at *2 (N.D. Ill. Nov. 12, 2010) (Coleman, J.).[11]

---

[11]Plaintiff urges the Court to follow *Zelman*—where Judge Coleman relied on two Illinois Supreme Court decisions to conclude that the Tort Immunity Act's statute of limitations does not apply to claims of retaliatory discharge under the IWA—because it "was the only case on point at the time Plaintiff filed her Amended Complaint asserting" the IWA claim and it would be "unfair" to apply *Kirley*. (R. 115, Pl.'s Mem. Opp'n Office's Mot. 7-8.) The Tort Immunity Act, however, was in effect long before plaintiff filed this action. Moreover, the Court agrees with the reasoning in *Kirley* and *Foster*, where Judges Holderman and Pallmeyer read the Illinois decisions less broadly and explained that while those cases may have limited the applicability of certain portions of the Tort Immunity Act, they did not stand for the proposition that a claim for retaliatory discharge is excluded entirely from the Tort Immunity Act and its limitations provision. *Kirley*, 2013 WL 6730885, at *11; *Foster*, 2014 WL 1876247, at *9-10.

Plaintiff contends that even if the one-year statute of limitations applies, her filing of a state-court lawsuit against defendants on May 25, 2012 within the one-year limitations period tolled the statute of limitations under Illinois's "one-refiling rule." (R. 115, Pl.'s Mem. Opp'n Office's Mot. 8.) Under the one-refiling rule, also known as the "savings" provision, 735 ILCS 5/13-217, a plaintiff who voluntarily dismisses a suit "may commence a new action within one year or within the remaining period of limitation, whichever is greater." Plaintiff's state-court action was dismissed for want of prosecution after the instant federal suit was filed. (R. 104-12.) Even if this disposition is equivalent to a "voluntary dismissal" for purposes of the savings provision (plaintiff cites no authority for the proposition), the provision does not save plaintiff's IWA claim, given what she alleged in the state-court case. For the savings statute to apply, the claims asserted in the first and second suits need not be identical, but they must arise from the same core of operative facts. *D'Last Corp. v. Ugent*, 681 N.E.2d 12, 16-17 (Ill. App. Ct. 1997). In her state-court complaint, plaintiff alleged retaliation in connection with "sexism," a "frat boy mentality," and her 2010 injury and medical leave. (R. 104-9, Compl.) Plaintiff did not allege any facts relating to her 2008 complaint for "racial intimidation" or the 2010 OIG complaint, or even generally anything about race discrimination or any workplace complaint she had made. Plaintiff's IWA claim does not arise from the same core of operative facts as those alleged in the state-court case, so the savings provision does not apply.

Because plaintiff's IWA claim was first filed in the First Amended Complaint on September 25, 2013, more than a year after her claim accrued, it is time-barred to the extent that it seeks damages, but not insofar as it seeks plaintiff's reinstatement and injunctive relief. *See Kirley*, 2013 WL 6730885, at *12 (holding that plaintiff could proceed with her IWA claim

29

insofar as she sought reinstatement and injunctive relief, and noting that the Tort Immunity Act states that nothing therein "affects the right to obtain relief *other than damages* against a local public entity"). Therefore, the Court will address defendants' next argument, which is that plaintiff cannot establish a causal connection between her termination and her complaints in 2008 and 2010. As discussed *supra* in regard to Count III, defendants contend, and have offered evidence, that plaintiff's termination was a result of her failure to report for work when directed to do so and her failure to contact her department. In response, plaintiff argues that there is "evidence of a retaliatory motive against" plaintiff in that during the door incident with Anthony Jordan, Jordan stated to plaintiff, "Why don't you go report this too, bitch. Why don't you go write this up too." (R. 115, Pl.'s Mem. Opp'n Office's Mot. 10; R. 113, Pl.'s Resp. Defs.' L.R. 56.1 Stmt., Add'l Facts ¶ 10; R. 113-3, Ex. 6, Gerri Kerulis Mem.)[12] According to plaintiff, those comments "suggest an atmosphere of retaliation against Plaintiff for having made complaints to OIG." (R. 115, Pl.'s Mem. Opp'n Office's Mot. 10; R.114, Pl.'s Mem. Opp'n Rohan's Mot. 9.) That is the extent of plaintiff's argument.

"[O]nce a defendant has adequately challenged the elements of a plaintiff's claim, it becomes the plaintiff's burden 'to identify specific facts in the record that demonstrate[] a genuine issue for trial.'" *Robinson v. Stanley*, No. 06 C 5158, 2011 WL 3876903, at *7 (N.D. Ill. Aug. 31, 2011) (quoting *Crawford v. Countrywide Home Loans, Inc.*, 647 F.3d 642, 647 (7th Cir. 2011)). Even assuming that plaintiff's complaints fit within the parameters of the IWA because she had "reasonable cause to believe" that she had disclosed a violation of a state or

---

[12]According to plaintiff's counsel, because Kerulis "was not available for deposition during the discovery period, the parties agreed that this document could be admitted in evidence for the truth of the matters asserted in it." (R. 113-3 at 2, Decl. of Jonathan B. Piper ¶ 5.)

federal law, rule, or regulation (plaintiff does not address this issue), she has failed to come forward with evidence from which a reasonable factfinder could conclude that she was discharged in retaliation for having complained about the incident with Petchenik and Struss or to the OIG about the political calls. "At the crux of causation in retaliatory discharge actions is the question of whether the employer had a retaliatory motive." *Michael v. Precision Alliance Grp., LLC*, 952 N.E.2d 682, 688 (Ill. App. Ct. 2011). Anthony Jordan was not plaintiff's supervisor; he was a co-worker, and there is no evidence that he was involved in or influenced the decision to terminate her employment. Because plaintiff has failed to point to any evidence that raises a genuine issue of fact as to her IWA claim, the Court grants defendants' motion for summary judgment on Count IV. In light of this ruling, the Court need not address Rohan's arguments pertaining to qualified immunity and whether he may be sued as an "employer" under the IWA.

### 4. Discrimination and Retaliation (Counts V, VI, and VIII)

Counts V and VI are race discrimination and retaliation claims against the Office for violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Court will analyze each claim separately, but the legal standards are the same. "A plaintiff can establish discrimination or retaliation in violation of Title VII using either the direct or indirect method of proof." *Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 727 (7th Cir. 2013), *cert. denied*, 135 S. Ct. 92 (2014).

Count VIII is a § 1983 race discrimination and retaliation claim against Rohan.[13]  This claim has the same standard of liability and is analyzed in the same way as the Title VII claims.  *See Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 750 n.2 (7th Cir. 2006) ("The only difference between a claim under Title VII and a claim under § 1983 is who can be named as a defendant in the action.").

### a.      Race Discrimination

Plaintiff contends that she has offered sufficient evidence to defeat summary judgment under either method of proof.  The Court will first address the indirect method, which requires the plaintiff to follow the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  *Johnson*, 733 F.3d at 728.  Under this method, Williams must first establish a prima facie case of intentional discrimination by showing that (1) she is a member of a protected class; (2) she was meeting defendants' legitimate performance expectations; (3) defendants took materially adverse employment actions against her; and (4) defendants treated her differently than similarly-situated employees outside her protected class.  *See, e.g., Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007).  "Under the

---

[13]In the Second Amended Complaint, plaintiff alleges in Count VIII that Rohan violated plaintiff's (1) First Amendment rights; (2) equal-protection rights, based on racial discrimination; and (3) due-process rights by causing her to be deprived of her expectation of continued employment. (Second Am. Compl. ¶ 111.) In her brief in response to Rohan's motion for summary judgment, plaintiff describes Count VIII as a claim that Rohan "terminated [plaintiff] because of her race" and in retaliation for "complaining about racial intimidation and politicking on the job by" employees of the Juvenile Probation Department. (R. 114, Pl.'s Mem. Opp'n Rohan's Mot. 2, 9.) She fails to develop any argument pertaining to due process, therefore abandoning that basis for Count VIII. *See Blise v. Antaramian*, 409 F.3d 861, 866 n.3 (7th Cir. 2005) ("The failure to develop an argument constitutes a waiver.").  The Court will confine its discussion to the alleged racial discrimination and retaliation.

*McDonnell Douglas* framework, after the plaintiff makes a prima facie case of discrimination or retaliation, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for its action. Doing so shifts the burden back to the plaintiff to show that the employer's proffered reason is pretext, which then permits an inference that the employer's real reason was unlawful." *Johnson*, 733 F.3d at 728. The ultimate burden of persuasion that defendants intentionally discriminated or retaliated against plaintiff remains with plaintiff. *See Fane*, 480 F.3d at 538.

It is conceded that plaintiff is a member of a protected class and that her termination in August 2011 was an adverse employment action. But the Office asserts that plaintiff cannot establish that similarly-situated employees outside her protected class were treated more favorably or, because plaintiff "abandoned" her job, that she met the Juvenile Probation Department's legitimate performance expectations. The Office also asserts that plaintiff cannot establish that she suffered any adverse employment actions other than her employment being terminated. (R. 107, Office's Mem. Supp. Mot. 13.)

Plaintiff confines her argument on this claim to her discharge and does not contend that she suffered any other adverse employment action. She maintains that she can demonstrate that defendants treated her differently than a Caucasian employee named Delores McCormick. "All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination. The 'similarly situated' prong establishes whether all things are in fact equal." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 704 (7th Cir. 2013) (ellipsis omitted). Although plaintiff need identify only one employee outside her protected class, that employee must be "directly comparable to her in all material respects." *Id.*

"The purpose of the inquiry is to eliminate other possible explanatory variables, such as differing roles, performance histories, or decisionmaking personnel, which helps isolate the critical independent variable—discriminatory animus." *Id.* (citations and internal quotation marks omitted). The similarly-situated requirement "normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 404-05 (7th Cir. 2007) (italics omitted). The analysis, however, is "flexible," *id.* at 405, and the proposed comparator "need not be identical in every conceivable way," *Perez*, 731 F.3d at 704. "[C]ourts must conduct a common-sense examination." *Id.* at 704 (internal quotation marks omitted).

Plaintiff contends that Delores McCormick was a similarly-situated co-worker but does not attempt to make a meaningful comparison. She fails to explain what position McCormick had or to whom she reported or any other basic information about her. Instead, plaintiff merely submits a number of records from Ms. McCormick's personnel file, from which the Court is unable to glean much except the following. (R. 113-3.)[14] McCormick requested medical leave in April 2009. (*Id.*, MISC 376.) Rose Golden sent McCormick a termination letter on May 26, 2009; the stated reason for the termination was McCormick's failure to apply for medical leave

---

[14]Plaintiff has also submitted records from the personnel files of Peter Thomas, Cheryl Anderson, and Anthony Jordan (R. 113-3), but fails to present any argument that these employees were similarly-situated employees outside of plaintiff's protected class who were treated better. The Court is not obliged to scour the record looking for factual disputes, *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 543-44 (7th Cir. 2011), or construct legal arguments for parties, *Anderson v. Catholic Bishop of Chicago*, 759 F.3d 645, 650 (7th Cir. 2014).

or disability and her absence for thirty days without notifying her employer of the reason for the absence. (*Id.*, MISC 375.) Apparently, McCormick was then reinstated, but the records do not disclose why. In spring 2012, McCormick evidently had been injured at work and, based on an IME report, was given certain deadlines in April 2012 by which to return to work or apply for disability benefits. After McCormick contacted Rose Golden, McCormick was given short extensions of those deadlines. (*Id.*, MISC 366, 365, 362.) Ultimately, however, Rohan sent McCormick a letter on May 8, 2012 terminating her employment for her failure to return to work, apply for disability, or submit requested documents from her physician in a timely fashion. (*Id.* MISC 362.)

Plaintiff argues that McCormick was treated more favorably than plaintiff was in that McCormick's termination was rescinded in 2009 and she was given "repeated opportunities" in 2012 to comply with return-to-work/documentation deadlines. In contrast, argues plaintiff, Golden sent plaintiff only one return-to-work letter and made no follow-up efforts. In plaintiff's view, the "discrepancies between the treatment of Plaintiff and Ms. McCormick are enough to create a genuine issue of fact for purposes of the 'indirect' test." (R. 115, Pl.'s Mem. Opp'n Office's Mot. 12.) The Court disagrees. Plaintiff has failed to provide evidence of the most basic aspect of the inquiry--that McCormick was situated similarly to her. Without this information (and analysis of it), plaintiff has failed to meet her burden on summary judgment. *See, e.g., Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 274 (7th Cir. 2004). As the Office points out, plaintiff has failed to provide evidence that McCormick's conduct was comparable to hers. The letters in McCormick's personnel file show that when McCormick received extensions of deadlines to submit documentation regarding her medical leave, she had personally

contacted Rose Golden by telephone. (R. 113-3, MISC 365, 362.) Plaintiff, on the other hand,

failed to contact anyone in her department after receiving the July 26, 2011 letter from Golden.

Plaintiff has failed to present evidence of a similarly-situated employee outside the protected

class who was treated more favorably; therefore, she cannot survive summary judgment under

the indirect method of proof.

"Under the direct method of proof, a plaintiff must provide either direct or circumstantial

evidence that the employer had a discriminatory motive." *Perez*, 731 F.3d at 710. Direct

evidence of discrimination is "something akin to an admission" by defendants that they fired

Williams because of her race. *See id.* (citing *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610

(7th Cir. 2006)). Williams does not present such evidence; she relies on circumstantial evidence.

To prevail, Williams must "construct a convincing mosaic" that would allow a jury to infer that

the decisionmakers intentionally discriminated against her. *See id.* "Generally, but not

exclusively, the pieces of that 'mosaic' will fall into three categories. The first includes

suspicious timing, ambiguous statements oral or written, and other bits and pieces from which an

inference of retaliatory intent might be drawn. The second is evidence, but not necessarily

rigorous statistical evidence, that similarly situated employees were treated differently. And the

third is evidence that the employer offered a pretextual reason for an adverse employment

action." *Id.* at 711 (citations and some internal quotation marks omitted).

Plaintiff has failed to present even a piece of a mosaic from which a reasonable jury

could conclude that her supervisors intentionally discriminated against her based on her race.

Plaintiff argues that her mosaic "derives from" the manner of her termination "on the basis of an

eight-month old IME report," "even in the face of her treating physician's determination that she

was not yet ready to return to work." (R. 115, Pl.'s Mem. Opp'n Office's Mot. 13.) As discussed *supra*, however, there is no evidence that those who made the decision to terminate plaintiff's employment were aware of plaintiff's physician's opinion, and the evidence is not that she was terminated based on an IME, but based on the fact that she failed to return to work or contact anyone in her department after having received Golden's letter. Plaintiff argues further that defendants treated her "arbitrar[il]y" by refusing to re-hire her after she attempted to return to work on September 6, 2011. (*Id.*) But no rational juror could find simply from the fact that the defendants failed to rehire plaintiff that it was because of her race. Plaintiff also cites Rohan's instruction "not to tell anyone" about her complaint about Struss and Petchenik. (R. 114, Pl.'s Mem. Opp'n Rohan's Mot. 10.) But she fails to explain how it can be reasonably inferred from this comment that Rohan was motivated by racial animus in deciding to terminate her employment nearly three years later. Plaintiff does not construct a mosaic of circumstantial evidence of discrimination, so she cannot prevail under the direct method of proof.

Because plaintiff has failed to present evidence that creates a genuine issue of fact under either the direct or indirect method of proving race discrimination, the Court grants defendants' motion for summary judgment on Count V and on Count VIII insofar as the claim is based on race discrimination.

### b. Retaliation

Under Title VII, it is unlawful for an "employer to discriminate against any of his employees" because the employee "has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42

U.S.C. § 2000e-3(a). In Count VI, plaintiff alleges that she was unlawfully terminated in retaliation for her complaint in 2008 about the conversation with Struss and Petchenik.

"A Title VII plaintiff can prove retaliation under either the direct or indirect method." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 537 (7th Cir. 2013) (citing *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 784 (7th Cir. 2007)). "The direct method requires proof that (1) the employee engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal link exists between the two." *Id.* "The indirect method requires proof that (1) the employee engaged in statutorily protected activity; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Id.* Plaintiff asserts that she can prove Count VI under both methods.

As to the direct method, the first two elements are not disputed, but the Office argues that plaintiff does not have evidence supporting an inference that her 2008 complaint about "racial intimidation" caused the Office to terminate her employment. To meet the causation requirement, plaintiff must show that her complaints were a "substantial or motivating factor" in the termination decision. *See Smith v. Bray*, 681 F.3d 888, 900 (7th Cir. 2012). Plaintiff does not present anyone's admission or anything akin to an admission that she was terminated for having complained, but contends that her "mosaic" of circumstantial evidence is as follows: At the Christmas party, Rohan told plaintiff not to tell anyone "outside of the building" what had happened; it took "months" for the investigation to begin; plaintiff's complaint was placed in her personnel file, but nothing was placed in Struss or Petchenik's files; Young did not create a report about the investigation until much later; and Rohan reviewed plaintiff's personnel file in

its entirety before approving the decision to terminate her employment.[15]  (R. 115, Pl.'s Mem. Opp'n Office's Mot. 14.)   Plaintiff also briefly discusses defendants' treatment of three co-workers—Delores McCormick, Anthony Jordan, and Cheryl Anderson.

"There is no bright-line rule as to the amount of evidence necessary to survive summary judgment under the direct method."  *Majors*, 714 F.3d at 538 (citing *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006)).   Plaintiff must "present admissible evidence that, when taken as a whole and viewed in a light favorable to" plaintiff's case, "could convince a reasonable jury that [s]he was the victim of unlawful retaliation."  *See Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643 (7th Cir. 2013).   A plaintiff's "mosaic" could include suspicious timing; ambiguous statements or behavior toward other employees in the protected group; evidence that similarly-situated employees outside of the protected group systematically receive better treatment; and evidence that the employer offered a pretextual reason for termination.  *Id.* at 643-44.   This is a non-exclusive list of factors to consider, and the "ultimate question the parties and the court always must answer is whether it is more likely than not that the plaintiff was subjected to the adverse employment action because of [her] protected status or activity."  *Id.* at 644.

The factors plaintiff has cited do not help to establish a link between her 2008 complaint and the termination of her employment in August 2011.  There is no suspicious timing involved; plaintiff was terminated nearly three years after she complained.  "The inference of causation weakens as the time between the protected expression and the adverse action increases, and then

---

[15]Plaintiff also argues that Rohan, Young, and Golden "accepted" Struss and Petchenik's version of the events, but that argument mischaracterizes the evidence.  The uncontradicted evidence is that in his investigation, Young was unable to determine who was telling the truth, and Struss and Petchenik were verbally admonished to be more careful in conversation.  (Young Dep. 31; Golden Dep. 63-69.)

additional proof of a causal nexus is necessary." *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 616 (7th Cir. 2001) (internal quotation marks omitted). Thus, the Seventh Circuit has "permitted retaliation charges to proceed in the face of long intervals only when additional circumstances demonstrate that an employer's acts might not be legitimate." *Id.* Plaintiff contends that the way in which her complaint was handled—the timing of the interviews, Young's failure to create a report about the incident until year or more later, the fact that Struss and Petchenik were not disciplined beyond an admonishment, and the fact that a copy of the complaint was placed in her file but not Struss or Petchenik's—supports an inference of retaliation. The argument amounts to dissatisfaction with the resolution of the complaint. That is not a basis for inferring bias. *See, e.g., Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1105-06 (7th Cir. 2012) (where plaintiffs had made a number of complaints about co-workers, some involving racial issues and others involving general workplace disputes, and defendants had investigated many of the complaints, took action on some of them, and declined to take action on others, and had criticized plaintiffs for a perceived lack of teamwork, stating that "[t]he plaintiffs contend that we can infer bias from these facts because the defendants did not respond to the plaintiffs' complaints as the plaintiffs would have liked. But the fact that someone disagrees with you . . . does not, without more, suggest that they *discriminated* against you."). Rohan's review of plaintiff's personnel file, which included the complaint, adds little to the picture; he already knew about the complaint from having dealt with it years before, and Rohan's review of the file was occasioned by Golden having first presented him with the issue of plaintiff's termination for his review and approval. (Rohan Dep. 9, 57.) "[M]ere knowledge of the plaintiff's protected activity prior to an adverse employment action does not establish a retaliatory motive." *Sanchez*

*v. Henderson*, 188 F.3d 740, 747 (7th Cir. 1999). As for Rohan's alleged instruction not to mention the matter outside of the building, it is too attenuated to support an inference of retaliation. There is no evidence that the stated reasons for plaintiff's termination were pretextual.

Plaintiff fails to show that McCormick, Jordan, and Anderson were similarly-situated employees. (For this reason, plaintiff's showing fails under the indirect method as well.) Plaintiff makes no attempt whatsoever to make this showing as to Anderson; plaintiff simply argues that the day after plaintiff was terminated, "Defendants terminated another black woman employee, Cheryl Anderson, who they claimed had made 'slanderous' allegations of racial and gender discrimination." (R. 115, Pl.'s Mem. Opp'n Office's Mot. 14.) For the reasons discussed *supra*, plaintiff also fails to demonstrate that Delores McCormick was similarly situated. As for Jordan, plaintiff summarizes what she characterizes as his "serious history of gross misconduct," (R. 115, Pl.'s Mem. Opp'n Office's Mot. 14-15), but fails to set out why he is directly comparable to her. Without more information, the Court cannot make a meaningful comparison between plaintiff and Jordan.

Because plaintiff has offered insufficient evidence to allow her retaliation claims to survive summary judgment under either the direct or indirect method of proof, the Court grants defendants' motion for summary judgment on Count VI and on Count VIII insofar as the claim is based on retaliation.

### 5. Section 1981 Race Discrimination (Count VII)

In Count VII, plaintiff alleges that Rohan intentionally discriminated against her based on her race. Citing *Ball v. City of Indianapolis*, 760 F.3d 636, 643 (7th Cir. 2014), Rohan contends

that the Seventh Circuit "recently addressed a similar cause of action for race discrimination and held that 42 U.S.C. § 1981 does not create a private right of action against state actors" and that § 1983 remains the sole avenue of relief for a violation of the rights protected by § 1981 when the claim is asserted against a government actor.  (R. 108, Rohan's Mem. Supp. Mot. 10.) Plaintiff concedes the argument "but reserves the right to appeal on that issue in light of the split among the circuits on this question."  (R. 114, Pl.'s Mem. Opp'n Rohan Mot. 9.)  Accordingly, Rohan's motion for summary judgment is granted on Count VII.

## CONCLUSION

Plaintiff's motion for summary judgment of liability on Count III [102] is denied. Defendants' motion for summary judgment [106] is granted.  Summary judgment is entered against plaintiff and in favor of the Office of the Chief Judge of the Circuit Court of Cook County, Illinois on Counts I, II, III, IV, V, and VI.  Summary judgment is entered against plaintiff and in favor of Michael Rohan on Counts IV, VII, and VIII.  Civil case terminated.


**SO ORDERED.**                **ENTERED:   May 21, 2015**


_____
**JORGE L. ALONSO**
**United States District Judge**