In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

Nos. 15-2325 & 15-2554

PAULA Y. WILLIAMS,

*Plaintiff-Appellant*,

*v.*

OFFICE OF THE CHIEF JUDGE OF COOK COUNTY, ILLINOIS and MICHAEL ROHAN,

*Defendants-Appellees*.

———————————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:13-cv-1116 — **Jorge L. Alonso**, *Judge*.

———————————

ARGUED APRIL 5, 2016 — DECIDED OCTOBER 11, 2016

———————————

Before WOOD, *Chief Judge,* and BAUER and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. Paula Williams was told she was fired from her position as a probation officer for abandoning her job. She brought this lawsuit alleging that she was actually fired for contesting a workers' compensation claim, reporting another employee's misconduct, being African-American, and reporting co-workers for racial hostility. Because Williams has failed to establish a material factual dispute as to any of her claims, we affirm the district court's grant of summary judgment to the defendants.

2                                        Nos. 15-2325 & 15-2554

## I. BACKGROUND

Williams began working for the Juvenile Probation Department of the Office of the Chief Judge of Cook County (OCJ) in November 1995. OCJ has more than two thousand employees and seven departments, one of which is the Juvenile Division. At the time she was fired, OCJ was run by Michael Rohan, who had the final say in all termination decisions. Starting in 2008, Williams had a series of interactions with the personnel department which she contends caused her termination.

### A.  Race Discrimination Complaint

In December 2008, Williams, who is African American, reported an incident of racial intimidation by two white co-workers. She wrote a memorandum to Charles Young, the deputy director of the Juvenile Probation Department, stating that one of the co-workers called her over and the other said to her, "When you go black you never go back and when you are white, you are always right." Williams found this comment to be "venomous." Two days later, Williams received a memo from Rohan acknowledging receipt of her report, apologizing for the behavior she described, and informing her that he was opening an investigation into the matter. Williams claims that later that month, Rohan approached her at the Probation Department's holiday party, and instructed her not to mention her memorandum to anyone outside of the building. Rohan does not recall such a conversation.

Eventually (the timing is disputed), the co-workers were interviewed, denied that their remarks were racially motivated, and were counseled not to make such remarks again. Over a year after the investigation was finished, Young created a memorandum of his investigation and placed it in Williams's personnel file. He testified he forgot to do so right after he finished his investigation.

### B.  Complaint to Office of Inspector General

In March 2010, Williams reported a supervisor in her department who was making phone calls about union matters to her work phone and to her parents' home. The Office of the Inspector General investigated the report as a potential misuse of County resources to support union candidates. The supervisor was eventually disciplined with a short suspension.

### C.  Workers' Compensation Dispute

In May 2010, Williams was injured at work by Anthony Jordan, a co-worker. Jordan yanked a door open while Williams was holding it, causing her to injure her shoulder. During the incident, he yelled, "Why don't you report this too, b**ch?" She took a medical leave for the injury, filed a workers' compensation claim, and began receiving temporary total disability (TTD) benefits. At the start of her leave, Rose Golden, the director of Human Resources for the department, sent Williams a letter asking her to let Golden know when she was able to return.

In December 2010, Williams received an independent medical evaluation (IME) from the Cook County Medical Office, which determined she was capable of returning to work. No one noticed the report until June 2011, when Jason Henschel, a claims adjuster for the risk management department, saw the report in Williams's workers' compensation file. Henschel informed Golden about the IME, and Golden sent Williams a letter asking her to return to work on August 2. It also directed her to obtain a return to work certification from the Medical Office and a release to return to work from her personal physician. The letter warned that if Williams failed to return to work, the Department would consider it an implied resignation, which was grounds for termination.

Williams went to the Medical Office for an evaluation on August 1. The county doctor approved Williams to return to work, but the form releasing her to return to work also noted

that her personal physician provided a note stating that she
was *not* able to return to work.

Meanwhile, Williams's attorney, Jason Marzal, was nego-
tiating her TTD benefits with Andrew Schwartz, an attorney
for the risk management office. Based on the IME, Schwartz
informed Marzal that the County would only pay benefits
through August 2. Marzal responded with a letter from Wil-
liams's personal physician stating she was unable to work un-
til August 10. On August 16, Marzal sent Schwartz a new note
from Williams's physician, stating she would be allowed to
return to work on September 3. On approximately August 22,
the attorneys discussed the case at the Illinois Workers' Com-
pensation Commission, and Marzal testified that the two
orally agreed that Williams would return to work on Septem-
ber 6. Schwartz denies reaching this agreement, and says the
conversation was only about settling the benefits dispute. A
couple of days later, Marzal sent Schwartz a fax informing
him that Williams would return to work on September 6 and
demanding reinstatement of her benefits.

During these negotiations, Williams did not inform
Golden of her new return to work date. Golden testified that
she did not know the negotiations were taking place at all.
After consulting with Rohan, Golden sent Williams a termi-
nation letter on August 30, stating that based on Williams's
failure to communicate any intent to return to work, and the
apparent expiration of her workers' compensation benefits,
OCJ was terminating her for implied resignation.

On September 6, Williams went to Golden and told her she
did not think she was supposed to return to work until that
day. Surprised, Golden called Schwartz to ask if he had au-
thorized a September 6 return to work date, and he denied
doing so. Golden reaffirmed the termination decision. On
September 22, Marzal and Schwartz finalized a settlement
agreement which provided Williams a lump-sum award and
6 weeks of TTD benefits for her workers' compensation claim.

That agreement listed Williams's return to work date as September 6.

### D. Proceedings Below

Williams brought this suit alleging that OCJ and Rohan terminated her for a variety of unlawful reasons. She sued under the Illinois Workers' Compensation Act, the Illinois Whistleblower Act, Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §§ 1981 and 1983. She also brought breach of contract and promissory estoppel claims. At the close of discovery, she moved for summary judgment on her workers' compensation claim, and the defendants moved for summary judgment on all of her claims. The district court granted the defendants summary judgment on all of her claims, and she appeals.

## II. ANALYSIS

On appeal, Williams argues that the district court erred in granting summary judgment to the defendants on each of her claims, and by denying her summary judgment on her workers' compensation claim. We review a district court's grant of summary judgment de novo, and construe all facts and draw all reasonable inferences in favor of the non-moving party. *Ellis v. DHL Express, Inc.*, 633 F.3d 522, 525 (7th Cir. 2011).

### A. Williams Failed to Meet Causation Requirement of Workers' Compensation Retaliation Claim

The Illinois Supreme Court has recognized a common-law cause of action for retaliatory discharge when an employee is terminated because of his actual or anticipated exercise of workers' compensation rights. *Kelsay v. Motorola, Inc.*, 384 N.E.2d 353, 357 (Ill. 1978). That cause of action is codified under the Illinois Workers' Compensation Act, 820 ILL. COMP. STAT. 305/4(h). In order to prevail on a retaliatory discharge claim, an employee must show (1) that he was an employee before the workplace injury, (2) that he exercised a right granted by the Act, and (3) that he was discharged for a reason that was causally related to his filing a claim under the Act.

*Clemons v. Mech. Devices Co.*, 704 N.E.2d 403, 406 (Ill. App. Ct. 1998). For example, a discharge based on a dispute about the extent or duration of a compensable injury can be retaliation under the Act. *Id*; *see also Hollowell v. Wilder Corp. of Del.*, 743 N.E.2d 707, 712 (Ill. App. Ct. 2001) (holding employer may not discharge an employee by unilaterally relying on independent physician's favorable diagnosis while at the same time dismissing employee's unfavorable diagnosis by his own physician).   Even when an employee's filing of a claim only proximately causes the discharge, the employee can sustain a retaliatory discharge claim. *Clark v. Owens-Brockway Glass Container, Inc.*, 697 N.E.2d 743, 746 (Ill. App. Ct. 1998). But that does not mean an employer can *never* discharge an employee who has filed a claim. So long as the reason for a discharge is wholly unrelated to an employee's claim for benefits, the employer is not liable for retaliatory discharge. *See id*.; *see also Horton v. Miller Chem. Co., Inc.*, 776 F.2d 1351, 1359 (7th Cir. 1985) (termination based on employer's incorrect assumption that employee could never perform job duties again not retaliatory); *Thomas v. Zamberletti*, 480 N.E.2d 869, 871 (7th Cir. 1985) (no retaliatory discharge when plaintiff discharged for failing to report to work); *Marin v. Am. Meat Packing Co.*, 562 N.E.2d 282, 286 (Ill. App. Ct. 1990) (employer may fire employee for absenteeism, even if absenteeism is caused by an injury which is compensable by workers' compensation).

Williams argues that her doctor's opinion about her return to work date caused her to believe she was permitted to stay off work until September 6. So, she argues, the conflict between her personal doctor's opinion and the IME caused her termination. In support of this argument, she relies heavily on *Grabs v. Safeway*, 97 N.E.2d 122 (Ill. App. Ct. 2009), an Illinois appellate case which held that an employer may not rely solely on an IME in terminating an employee for failing to call in his absences. There, the plaintiff was injured and filed a claim with his employer, which was initially approved. His

physician ordered him to continue off work, but an independent examiner disagreed. *Id*. at 125–26. Grabs followed his physician's advice, but as a result of the IME, his employer recoded his absence in the attendance system, which imposed a new requirement on him to call in to work, a requirement from which he was exempt while on workers' compensation leave. Because Grabs was unaware of the change, he failed to call in to report his absences, and was fired. The court held that it would be improper for the employer to take an employment action (recoding the plaintiff's attendance status) based on a medical report that was disputed by other physicians. *Id*. at 124. But it also noted that a plaintiff cannot use his workers' compensation claim as a shield from compliance with other personnel rules. *Id*. at 134 (citing *Finnerty v. Personnel Bd. of the City of Chi.*, 707 N.E.2d 600 (Ill. App. Ct. 1999)).

We see a critical difference between *Grabs* and this case. In *Grabs,* a decision-maker acted improperly on the knowledge of the disputed IME by recoding the plaintiff's work status in the attendance system. That improper act caused the plaintiff's termination. There is no evidence here that Golden acted *with knowledge* that Williams disputed her return to work date. In fact, Golden testified she had no idea Williams believed her return to work date was September 6. From Golden's vantage point, Williams simply decided not to return to work.

The facts here are more akin to *Beatty v. Olin*, 693 F.3d 750 (7th Cir. 2012), where the decision-maker who fired the plaintiff had no knowledge of his return to work status. *Id*. at 751–52. We held there that firing someone based on incomplete or inaccurate information is legally insufficient to make out a retaliatory discharge claim—rather, a plaintiff must provide evidence that her employer *was motivated* to fire her for exercising her workers' compensation rights. *Id*. at 754. We also required that a plaintiff who argues that a decision-maker is lying about his ignorance of an underlying workers' compensation dispute provide evidence to support that position. *Id*. Similar to the plaintiff in *Beatty*, Williams failed to provide

any evidence that Golden knew that there was a dispute about her readiness to return to work. She argues that Marzal told Schwartz that she would return on September 6, who in turn said he would pass the message to "his client." But there is no evidence that Schwartz meant he would tell Golden about the return to work date, and he denies talking to Golden about the matter prior to Williams's termination. A fact-finder could not reasonably leap from Schwartz's nebulous assurance to Marzal to the inference that Golden knew about the disputed return-to-work date when she fired Williams.

To surmount this obstacle, Williams draws on Illinois case law that notice to an attorney constitutes notice to her client. S*egal v. Ill. Dep't of Ins.*, 938 N.E.2d 192, 195 (Ill. App. Ct. 2010); *Williams v. Dorsey*, 652 N.E.2d 1286, 1290 (Ill. App. Ct. 1995); *Eckel v. Bynum*, 608 N.E.2d 167, 174 (Ill. App. Ct. 1992). But each of these cases deals with notice of judicial proceedings, not notice of the contents of every discussion between attorneys during a settlement negotiation. While we agree with the district court that the lack of coordination between departments is unfortunate, "the retaliatory-discharge cause of action is narrow and requires evidence of *retaliatory motive*, not just sloppy personnel practices." *Beatty*, 693 F.3d at 754 (emphasis in original). Employees can avert the danger of falling victim to disjointed intra-agency communications by keeping decision-makers informed of the status of their claims.

### B.  No Breach of Contract or Estoppel

Williams's second argument on appeal is that the district court erred in granting summary judgment to the defendants on her breach of contract and promissory estoppel claims. She argues that by firing her, OCJ breached a verbal contract formed by Marzal and Schwartz regarding her return date.

Under Illinois contract law, which applies here, a plaintiff must show evidence of offer and acceptance to sustain a breach of contract claim. *Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.,* 493 F.3d 841, 849 (7th Cir. 2007) (citing *MC Baldwin*

*Fin. Co. v. DiMaggio, Rosario & Veraja, LLC*, 845 N.E.2d 22, 30
(Ill. App. Ct. 2006)). For an oral contract to exist, the parties
must have a meeting of the minds with respect to the terms of
the agreement and must intend to be bound by the agreement.
*Podolsky v. Alma Energy Corp., Inc.*, 143 F.3d 364, 369 (7th Cir.
1998).

Williams needed to put forth evidence to create a factual
dispute about the following two issues: first, that Schwartz
entered into an agreement with Marzal about Williams's re-
turn date, and second, that OCJ authorized him to do so. *Dan-
ziger v. Pittsfield Shoe Co.*, 68 N.E. 534, 535–36 (Ill. 1903). To sup-
port Schwartz's authority to enter into the agreement, Wil-
liams provides Marzal's deposition testimony that he regu-
larly negotiated return to work dates with attorneys in
Schwartz's office, and argues that Golden would not have
called Schwartz to inquire about whether he had altered her
return to work date if he lacked the authority to do so. To sup-
port the fact that Schwartz actually bound OCJ to the Septem-
ber 6 return date, she points to Marzal's deposition testimony
that on August 22, he had a conversation with Schwartz in
which Schwartz agreed to let Williams return on September
6, and to the written settlement agreement, which listed her
return to work date as September 6.

At his deposition, Marzal testified that his understanding
from verbal conversations with Schwartz was that Williams
was authorized to return to work on September 6. When
asked why he believed this, he testified it was because "ver-
batim I can't tell you, but basically [Schwartz] was in concur-
rence with her returning back to work on the 6th, and he would
communicate that to his client." He also stated that
"[Schwartz] represented that [Williams returning to work on
September 6] is a problem and that we have to resolve it in
Paula Williams's favor." When pressed as to how OCJ would
resolve it in Williams's favor, Marzal stated, "[Schwartz] said
that Dr. Labanauskis is releasing her to go back to work and
we will let her go back to work on the 6th. Basically that's what

he's saying. I didn't write down my conversation with him."
A reasonable jury could conclude that saying "we will let her
go back to work on the 6th" was a clear, unambiguous promise
from Schwartz to Marzal that Williams could return to work
on August 6. So it seems that Williams has mounted her first
hurdle.

The trickier question is whether Schwartz was actually au-
thorized to bind OCJ to such a promise. Whether an agency
relationship exists is generally a fact question, although a
court may decide it as a question of law if only one conclusion
may be drawn from the undisputed facts. *Churkey v. Rustia,*
768 N.E.2d 842, 845 (Ill. App. Ct. 2002). A party can establish
an implied agency relationship through circumstantial evi-
dence. *C.A.M. Affiliates, Inc. v. First Am. Title Ins. Co.,* 715
N.E.2d 778, 783 (Ill. App. Ct. 1999). When settlements are
made out of court, Illinois law does not presume that an at-
torney has authority to bind his client, and assigns the burden
of proof to the party alleging authority. *Brewer v. Nat'l R.R.
Passenger Corp.,* 649 N.E.2d 1331, 1334 (Ill. 1995) (citing *Dan-
ziger,* 68 N.E. at 535–36). In the absence of proof of express au-
thority, an attorney's representations are not binding when
they are later invoked against his client. *Id.*

The two pieces of evidence that Williams provides—Mar-
zal's testimony that he regularly negotiated return dates with
Cook County state's attorneys, and Golden's testimony that
she checked with Schwartz about promising Williams a later
return date—could not lead a reasonable fact-finder to con-
clude that OCJ expressly authorized Schwartz to determine
Williams's return date. She also points to the settlement agree-
ment the attorneys eventually entered with the Commission
on November 26, which states that Williams was temporarily
totally disabled through September 6. But the same document
states that Williams was terminated on August 30 for alleged
job abandonment. So the document cannot reasonably sup-
port an inference that OCJ authorized Schwartz to permit Wil-
liams to return to work on September 6.

As an alternative to her contract theory, Williams advances an estoppel theory. (She does not specify if it is an equitable or promissory estoppel theory, but she appears to advance arguments under both doctrines, and similar considerations apply for each under our analysis. *Matthews v. Chi. Transit Auth.*, 51 N.E.3d 753, 780 n. 11 (Ill. 2016)). She argues that regardless of whether Schwartz was expressly authorized by OCJ to set her return to work date, she reasonably relied on his promise that she could return to work on September 6 and was detrimentally impacted as a result. Schwartz is not a named defendant in this lawsuit, so we assume that OCJ and Rohan are the targets of her estoppel claim.

Under Illinois law, to obtain equitable estoppel against a municipality, a plaintiff must demonstrate that (1) the municipality affirmatively acted, (2) the affirmative act induced substantial reliance, and (3) the aggrieved party substantially changed its position as a result of its justifiable reliance. *Morgan Place of Chi. v. City of Chi.*, 975 N.E.2d 187, 195 (Ill. App. Ct. 2012) (holding that plaintiffs' reliance on assertions by city officials about building permits did not warrant equitable estoppel against city). Justifiable reliance means that a plaintiff cannot "shut his eyes to obvious facts, or neglect to seek information that is easily accessible, and then charge his ignorance to others." *Village of Wadsworth v. Kerton*, 726 N.E.2d 156, 164-65 (Ill. App. Ct. 2000).

Equitable estoppel is generally disfavored against municipal bodies, unless "it is necessary to prevent fraud and injustice." *Halleck v. Cnty. of Cook*, 637 N.E. 2d. 1110, 1114 (Ill. App. Ct. 1994). The affirmative act must be made by the body itself, such as by a legislative enactment. *See Schivarelli v. Chi. Transit Auth.*, 823 N.E.2d 158, 167-68 (Ill. App. Ct. 2005). Unauthorized acts of ministerial officers or misinterpretations generally do not meet the affirmative act requirement. *Id.* (finding no estoppel against transit authority board when it did not approve an agreement made between one of its employees and

plaintiff). Representations by an attorney have been held insufficient to bind a municipality under the doctrine of estoppel. *Hamwi v. Zollar*, 702 N.E.2d 592, 598 (Ill. App. Ct. 1998) (finding no estoppel where department attorney represented that plaintiff's disciplinary record would be expunged and department later denied his expungement application); *Marx v. State Dept. of Revenue*, 519 N.E.2d 82, 84 (Ill. App. Ct. 1988) (representations of Attorney General's office regarding monetary penalty did not work an estoppel against the state when it imposed greater penalties).

However, occasionally, Illinois courts have found circumstances to be unjust enough to warrant estoppel. The general disfavoring of estoppel against a municipality is "qualified to enable a party to invoke [estoppel] where his action was induced by the conduct of a municipal official, and where, in the absence of such relief, he would suffer a substantial loss." *Chicago v. Miller*, 188 N.E.2d 694, 696 (Ill. 1963). For example, erroneous conferral of public benefits is not normally a ground for estoppel, but at least one appellate court has held that the Illinois Department of Public Aid can be estopped from recouping benefits from a plaintiff when one of its employees repeatedly miscalculated a claimant's benefits over the course of five years. *Kruse v. Dep't of Pub. Aid*, 596 N.E.2d 743, 745-46 (Ill. App. Ct. 1992). Similarly, while injury stemming from the issuance of an unauthorized permit does not typically warrant estoppel, where a municipal body "ratifies" the issuance by failing to revoke the permit for an extended period of time, estoppel has been found appropriate. *Cities Service Oil Co. v. Des Plaines*, 171 N.E.2d 605, 608 (Ill. 1961); *Hagee v. Evanston*, 414 N.E.2d 1184, 1187 (Ill. App. Ct. 1980).

It is hard to draw a clear line from this precedent to delineate where under Illinois law, an injustice is severe enough, and unfair enough, to warrant estoppel. But we find even taking all of Williams's factual allegations as true, they are insufficient to justify estoppel. Here, Marzal testified that Schwartz agreed to the September 6 return date and that he explicitly

promised to convey the new date to "his client." But distinct
from the rare cases in which Illinois courts have applied es-
toppel, there is no evidence that Schwartz's misrepresentation
was ratified by OCJ. In the absence of proof that he was au-
thorized to give Williams a new return to work date,
Schwartz's promises regarding Williams's return date must be
viewed as *ultra vires* acts by a municipal employee. When OCJ
discovered that he may have promised Williams a different
return date, it did not permit Williams to return to work, or
otherwise ratify his misrepresentation. To the contrary,
Golden sent Williams home, and later reaffirmed her termi-
nation. Williams was misled by Schwartz, but not by OCJ.
While it is a close question, we find estoppel to be an inappro-
priate remedy for the factual circumstances before us.

### C. Williams Has Failed to Produce a Material Factual Dispute About Race Discrimination or Retaliation

Williams next argues that she provided enough evidence
to create a material factual dispute about whether she was
fired because of her race, in violation of Title VII. We recently
discarded the direct and indirect methods of proof for retali-
ation claims, and held that a plaintiff can surmount summary
judgment if a reasonable factfinder could conclude that the
plaintiff's race caused the discharge. *Ortiz v. Werner Enters.*,
No. 15-2574, 2016 WL 4411434, at *4 (7th Cir. Aug. 9, 2016),
slip op. 10. We must consider evidence as a whole, rather than
by asking whether any particular piece of evidence proves the
case by itself. *Id*.

There is simply not enough evidence for a reasonable fact-
finder to rule in favor of Williams. Her only evidence is that a
white employee was given several chances to return to work
after taking a similar leave. But to prevail by showing differ-
ential treatment of a similarly situated employee, a plaintiff
must identify a comparator who is "directly comparable to
her in all material respects … to eliminate other possible ex-
planatory variables." *Perez v. Thorntons, Inc.,* 731 F.3d 699, 704

(7th Cir. 2013). Here, the record evidence shows that the white employee repeatedly contacted Golden to keep her abreast of her extension requests. Golden testified that Williams was not fired for asking for extensions of leave, but for failing to get in touch at all. This was a material difference between the two employees, which prevents Williams from arguing she was treated differently when all things were "in fact equal." *Filar v. Bd. of Educ. of City of Chi.*, 526 F.3d 1054, 1061 (7th Cir. 2008). Williams has not identified a similarly situated employee, which is fatal to her discrimination theory.

Williams also argues that she was fired for reporting racial discrimination by her white co-workers, in violation of 42 U.S.C. § 2000e-3(a). To overcome summary judgment on this claim, she needs to show that she was fired, that she engaged in protected activity, and that the latter caused the former. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013). In support of her retaliation claim, Williams offers that Rohan instructed her not to talk about the incident outside of the building, that the department's investigation into the incident lagged after she made the initial report, that a copy of her report was placed into her personnel file but not her co-workers', and that Rohan reviewed her personnel file before deciding to fire her. Again, Williams has not met her summary judgment burden. Williams made the report close to three years before she was terminated. The handling of the report did not create an inference of retaliation. While there may have been some delays in the investigation, there is no evidence that the delays were in any way related to Williams's eventual termination. The most nefarious inference that can be drawn from Williams's version of the facts is that the department felt the need to get Williams's personnel file in order before terminating her. That still does not support an inference that her report of racial harassment caused her termination. And a reasonable factfinder could not infer that Rohan's comment three years before Williams's termination to keep

the matter confidential was evidence that he planned to fire her.

Williams also asks us to overrule our own precedent and find that Rohan can be held liable for race discrimination and retaliation under 42 U.S.C. § 1981. We decline to do so. *See Campbell v. Forest Preserve Dist. of Cook Cnty.*, 752 F.3d 665, 671 (7th Cir. 2014) (§ 1981 does not create a private right of action against state actors).

### D. No Illinois Whistleblower Act Violation

Williams's final theory of liability against the defendants is that they violated the Illinois Whistleblower Act by terminating her for reporting unlawful misconduct against her co-workers and for reporting misconduct by a supervisor to the OIG. The parties dispute whether Williams brought this claim in time to avoid the one year statute of limitations for tort actions against governmental entities. 745 ILL. COMP. STAT. 10/8-101(a). It is unclear under Illinois law whether this statute of limitations applies to retaliatory discharge claims under the Illinois Whistleblower Act, although one appellate court seemed to suggest that it might. *See Taylor v. City of Chi.*, 10 N.E.3d 383, 395 (Ill. App. Ct. 2014). Rather than attempting to resolve this question, we conclude that even if the claim was timely, it did not meet the summary judgment standard for whistleblower claims. In order to show whistleblower retaliation, a plaintiff must provide some evidence that the employer had a retaliatory motive. *See Michael v. Precision Alliance Grp., LLC*, 952 N.E.2d 682, 688 (Ill. App. Ct. 2011). There is no evidence of a retaliatory motive here. Williams points to Anthony Jordan's remark ("Why don't you go report this too, b**ch?"), indicating that others knew about her prior reports. But Jordan was not a decision-maker at OCJ, and there is no evidence that his views of Williams's whistleblowing activities—or anyone else's—influenced Rohan or Golden's decision to fire her.

16                                    Nos. 15-2325 & 15-2554

### E.  No Abuse of Discretion to Award of Costs to OCJ

Finally, Williams argues that the district court abused its discretion by awarding the defendants costs. A district court should provide an explanation for its decision to award or deny costs. *Rivera v. City of Chicago*, 469 F.3d 631, 636 (7th Cir. 2006). It only abuses its discretion in reviewing a bill of costs if "no reasonable person could take the view adopted by the trial court." *Id*. The district court evaluated the documentation that Williams provided and found that she had more than sufficient income to pay the bill of costs. While Williams referenced an outstanding medical bill, she did not provide any documentation or explanation for the bill and its impact on her ability to pay the bill of costs. Under an abuse-of-discretion standard, there is no basis for vacating the award.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment.

CERTIFIED COPY

A True Copy
Teste:

_____
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit